TROUTMAN PEPPER HAMILTON SANDERS LLP
Brian P. Watt (*pro hac vice forthcoming*)
brian.watt@troutman.com
T. Scott Mills (SBN 313554)
scott.mills@troutman.com
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia 30308-2305
Telephone:   404.885.3000
Facsimile:   404.885.3900

Elizabeth Holt Andrews (SBN 263206)
elizabeth.andrews@troutman.com
333 Twin Dolphin Drive, Suite 400
Redwood City, California 94065-1434
Telephone:   650.802.3611
Facsimile:   650.802.3650

Attorneys for Plaintiff
GROCERY OUTLET, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GROCERY OUTLET, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NAFTALI, INC., <br><br> Defendant. | Case No. 3:23-cv-5254 <br><br> **COMPLAINT FOR:** <br><br> **1. BREACH OF CONTRACT;** <br><br> **2. CONTRACTUAL INDEMNIFICATION;** <br><br> **3. BREACH OF EXPRESS WARRANTY;** <br><br> **4. BREACH OF IMPLIED CONTRACT;** <br><br> **5. IMPLIED CONTRACTUAL INDEMNIFICATION;** <br><br> **6. BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY; AND** <br><br> **7. VIOLATION OF CAL. BUS. & PROF. CODE § 17200** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

161213458

Plaintiff Grocery Outlet Inc. ("Grocery Outlet"), by and through its undersigned counsel, for its Complaint against Defendant Naftali, Inc. ("Naftali"), states and alleges as follows:

## INTRODUCTION

1. In May and June 2020, at the height of the COVID-19 pandemic, Grocery Outlet contracted with Naftali to purchase sanitizing wipes (the "Goods" or "wipes") to sell at Grocery Outlet's retail supermarket locations.

2. Naftali, a national manufacturer and marketer of travel and well-being products, represented that the wipes could be used to sterilize, to kill germs on, and/or as an antibacterial on both surfaces and skin and that the wipes were in full compliance with federal and state law.

3. Unbeknownst to Grocery Outlet at the time, Naftali's wipes are considered pesticides under federal law because the wipes' labels made pesticidal claims, including that they would sterilize surfaces and kill germs on surfaces. However, Naftali had not registered the wipes as pesticides as required by California and federal law.

4. Following inspections of Grocery Outlet's stores, both the U.S. Environmental Protection Agency (the "EPA") and the California Department of Pesticide Regulation (the "CDPR") identified the Goods as unregistered pesticides.

5. As a result, the EPA brought an enforcement action and assessed a civil administrative penalty against Grocery Outlet for selling the unregistered pesticides in violation of federal law.

6. Making matters worse, because the wipes were unregistered pesticides, they were entirely useless to Grocery Outlet during the most vital time period for the use of the Goods.

7. Through this action, Grocery Outlet seeks indemnity from Naftali for the costs and penalties associated with the EPA's enforcement action with respect to the Goods, as well as direct and consequential damages for Naftali's breach of the parties' agreement and Naftali's warranties, both express and implied.

## PARTIES

8. Plaintiff Grocery Outlet Inc. is a California corporation with its principal place of business in Emeryville, California. Grocery Outlet is a value retailer of quality, name-brand

consumables and fresh products sold through a network of independently-operated stores in California, Washington, Oregon, Pennsylvania, Idaho, Nevada, Maryland and New Jersey.

9. Naftali, Inc. is a Florida corporation with its principal place of business in Miami Gardens, Florida. Naftali holds itself out as a national manufacturer and marketer of travel and well-being products.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in dispute is greater than $75,000.

11. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because this District is where the relevant agreements were negotiated and where the Goods at issue were sold.

## GENERAL ALLEGATIONS

**A.  Grocery Outlet Purchased Wipes from Naftali.**

12. Between May and July 2020, Grocery Outlet purchased 718,032 total units of Naftali's wipes, at a total cost of $1,802,253.12.

13. The Goods included four different product types: (i) Miami Carryon Antiseptic, Non-Alcohol Wipes (40/50ct), (ii) Miami Carryon Antiseptic, Non-Alcohol Wipes (24/100ct), (iii) Miami Carryon 75% Alcohol Wipes (24/80ct), and (iv) Love of Dream Antibacterial Wipes (40/50ct). True and correct copies of the Purchase Orders are attached hereto and incorporated herein by reference collectively as Exhibit "A."

14. Naftali represented that the Goods would be acceptable for both surface and skin use.

15. Given the context of the pandemic, Grocery Outlet purchased the Goods in material reliance on Naftali's representations.

16. In the Purchase Orders, Naftali provided the following warranty:

> Except for Goods that Buyer has agreed to recondition, **Seller expressly warrants that the Goods are not subject to any label-change or tag-removal requirements**, or the like, and Seller expressly authorizes Buyer to resell the Goods in the condition in which the Goods are delivered to Buyer by Seller.

(Emphasis added.)

17. Additionally, Naftali agreed:

> **Seller is in full and absolute compliance with any and all legal and/or regulatory requirements and guidelines relating to the Goods, including, without limitation, all issues relating to:** advertising, **labeling**, **packaging**, manufacture, delivery and sale. **Seller expressly warrants that all Goods comply with all state, federal, and local laws and regulations applicable to the Goods, including without limitation California's Proposition 65 and the Consumer Product Safety Improvement Act of 2008**, as may be amended.

(Emphases added.)

18. Finally, Naftali agreed that it would:

> **[D]efend, indemnify and hold harmless Buyer and its parent, subsidiary, or other related or affiliated entities from and against any lawsuit, claim or demand of any kind or nature whatsoever, arising as a result of or in connection with the Goods sold under this agreement or the terms of the Purchase Order.** Seller expressly warrants and represents that Seller will be in full compliance with all certification, testing and other requirements under applicable law, including without limitation testing and certification of Goods under the Consumer Product Safety Act of 2008 ("CPSA").

(Emphasis added.)

**B.   Government Agencies Identified the Goods as Noncompliant with Applicable Law.**

19. As a result of a March 9, 2021 inspection of one of Grocery Outlet's stores, the EPA notified Grocery Outlet on March 16, 2021 that it identified the Goods as unregistered pesticides

and thus noncompliant with the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136 *et seq*. ("FIFRA"). A true and correct copy of the EPA's March 16, 2021 email, including the attached "Grocery Outlet Inspection Report," is attached hereto and incorporated herein by reference as Exhibit "B".

20. The EPA's determination was based on pesticidal claims on the Goods' labeling that stated the Goods would sterilize and kill germs on surfaces and/or were antibacterial when used on surfaces. Such claims rendered the Goods pesticides under FIFRA. However, contrary to its representations to Grocery Outlet, Naftali had not registered the Goods such that they would be in compliance with FIFRA.

21. On February 15, 2023, the Region IX office of the EPA sent Grocery Outlet a letter confirming the alleged violations of FIFRA and threatening to pursue a civil administrative complaint against Grocery Outlet.

22. Specifically, the EPA alleged that, by selling Naftali's wipes, "Grocery Outlet has violated Section 12(a)(1)(A) of FIFRA, 7 U.S.C. §§ 136j(a)(1)(A), at its marketplaces located in California" by "selling and distributing unregistered pesticides." A true and correct copy of the EPA's February 15, 2023 letter is attached hereto and incorporated herein by reference as Exhibit "C".

23. In addition to the EPA's actions, on February 3, 2021, the CDPR also found that the Miami Carryon 75% Alcohol Wipes and Love of Dream Antibacterial Wipes were in violation of the California Pesticide Statutes, specifically that they were "not [] registered pesticide[s] pursuant to Food and Agricultural Code Section 12811, which requires all pesticides to be registered in California." A true and correct copy of the CDPR Pesticide Statutes Violation Notices is attached hereto and incorporated herein by reference as Exhibit "D".

**C.   Grocery Outlet Promptly Revoked Acceptance of the Goods, and Naftali Subsequently Refused to Issue a Refund or Abide by Its Duty to Indemnify Grocery Outlet.**

24. On May 20, 2021, Grocery Outlet notified Naftali that the EPA identified the Goods as unregistered pesticides.

25. Because the Goods did not conform to the parties' agreement(s) in the Purchase Orders, Grocery Outlet revoked its acceptance of the Goods that were unsold and unused as of May 20, 2021.

26. Grocery Outlet demanded a full refund of the money it paid to Naftali for the remaining units and the removal of the Goods from its stores by May 31, 2021.

27. Grocery Outlet also notified Naftali that, pursuant to their agreement(s), Grocery Outlet would seek indemnification from Naftali for any penalties or fines imposed against it as a result of Naftali's non-conforming Goods.

28. Over the course of the next three months, the parties exchanged further correspondence in which Naftali repeatedly refused to accept responsibility for its non-conforming Goods and refused to abide by the terms of the agreement(s).

29. On or about March 8, 2021, Grocery Outlet issued a comprehensive recall of all unsold Goods. Grocery Outlet's operators removed at least 160,015 units of the Goods from its stores' shelves.

30. The recalled Goods cost Grocery Outlet $425,929.89 at the time of purchase.

**D.  The EPA Imposed a Civil Penalty Against Grocery Outlet.**

31. While Naftali refused to accept responsibility for its non-conforming Goods, Grocery Outlet worked with the EPA over the course of five months to resolve the investigation into the alleged violation of FIFRA as a result of Naftali's Goods.

32. On August 29, 2023, the EPA and Grocery Outlet executed a Consent Agreement and Final Order Pursuant to 40 C.F.R. §§ 22.13(b) and 22.18(b) (the "CAFO"), in which Grocery Outlet was assessed "a civil administrative penalty in the amount of **THREE HUNDRED NINETY-TWO THOUSAND DOLLARS ($392,000)** as final settlement and complete satisfaction of the civil claims against [Grocery Outlet] arising from" the EPA's allegations against Grocery Outlet that it sold unregistered pesticides, including the Goods. A true and correct copy of the CAFO is attached hereto and incorporated herein by reference as Exhibit "E".

33. Of the 63 total violations established by the CAFO, 59 are attributable to the Goods Naftali sold to Grocery Outlet.

34. The pro rata share of the civil administrative penalty attributable to the Goods Naftali sold to Grocery Outlet is $367,111.11.

35. Grocery Outlet paid the penalty on September 14, 2023. A true and correct copy of Grocery Outlet's September 15, 2023 letter to the EPA confirming payment, including the proof of payment enclosed therein, is attached hereto and incorporated herein by reference as Exhibit "F".

36. In the CAFO, the EPA specified that the "Love of Dream Antibacterial Wipes" product sold by Naftali has the following labeling that renders it a "'pesticide' as that term [is] defined by FIFRA":

    a. The front label states, in part, "Antibacterial Wipes," "Efficient Sterilization," and "99.9% sterilization rate."

    b. The back label states "Scope of Application: Cleaning of objects surface and skin."

    c. The back label states "Main Ingredients: Non-woven fabric, pure water, disinfectant."

Ex. E ¶¶ 19–21. "The label contains neither an EPA product registration number nor an EPA producing establishment number," and the product is not registered as a pesticide in violation of FIFRA. Ex. E ¶¶ 19, 22.

37. In the CAFO, the EPA specified that the "Miami Sterilizing Antiseptic Wipes" product sold by Naftali has the following labeling that renders it a "'pesticide' as that term is defined by FIFRA":

    a. The front label states "sterilizing antiseptic wipes," "Kills 99% of germs," and "Multi surface."

    b. The back label states "sterilization of skin and surfaces to help decrease bacteria."

    c. The back label states "Ingredients: non-woven fabric, cetylpyridinium chloride (w.w, 0.03%), probylene glycol, pure water."

Ex. E ¶¶ 31–33. "The label contains neither an EPA product registration number nor an EPA producing establishment number," and the product is not registered as a pesticide in violation of FIFRA. Ex. E ¶¶ 31, 34.

38. In the CAFO, the EPA specified that the "Miami 75% Alcohol Wipes" product sold by Naftali has the following labeling that renders it a "'pesticide' as that term is defined by FIFRA":

    a. The front label states "75% Alcohol Wipes, Kills 99.99% of Germs" and "For daily cleaning and sterilization especially hands and skin."

    b. The back label under "Usage and Functions:" lists "Equipment cleaning and sterilization."

Ex. E ¶¶ 37–39. "The label contains neither an EPA product registration number nor an EPA producing establishment number," and the product is not registered as a pesticide in violation of FIFRA. Ex. E ¶¶ 37, 40.

39. On September 25, 2022, Grocery Outlet made a final demand that Naftali indemnify Grocery Outlet for its share of the civil penalty. Naftali refused to indemnify Grocery Outlet.

## FIRST CLAIM FOR RELIEF

**(Breach of Contract – Cal. Com. Code §§ 2711, 2714)**

40. Grocery Outlet incorporates the above allegations as if set forth fully herein.

41. "An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Cal. Com. Code § 2206(1)(a).

42. "An order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods . . . ." Cal. Com. Code § 2206(1)(b).

43. By submitting the Purchase Orders to Naftali, Grocery Outlet extended an offer to buy the Goods pursuant to the terms of the Purchase Orders. Ex. A.

44. In response, Naftali accepted Grocery Outlet's offer by shipping the Goods, thereby agreeing to the terms of the Purchase Orders.

45. Pursuant to the terms of the Purchase Orders, Naftali agreed to provide wipes that were "in full and absolute compliance with any and all legal and/or regulatory requirements and

guidelines relating to the Goods, including, without limitation, all issues relating to: advertising, labeling, packaging, manufacture, delivery and sale." Ex. A.

46. Naftali breached the parties' agreement(s) by delivering wipes that were in violation of FIFRA and Cal. Food & Agric. Code § 12811, *et seq*.

47. As explained above, because the Goods were not registered as pesticides, the Goods' labels could not lawfully make claims that they could be used to sterilize surfaces, to kill germs on surfaces, or as an antibacterial on surfaces. Grocery Outlet therefore could not lawfully resell the Goods as products designed for these purposes.

48. Naftali breached the clear terms of the Purchase Orders by delivering Goods that did not conform to the terms of the Purchase Orders.

49. Naftali's breach of the Purchase Orders directly caused the EPA's enforcement action against Grocery Outlet with respect to the Goods.

50. As a direct and proximate cause of Naftali's breach of the Purchase Orders, Grocery Outlet suffered damages in the amount it paid for the Goods.

51. Additionally, Grocery Outlet suffered consequential damages as a result of Naftali's breach, including the costs and penalties associated with the EPA's enforcement action as well as reasonable attorney's fees and costs incurred in responding to the enforcement action.

## SECOND CLAIM FOR RELIEF

### (Contractual Indemnification)

52. Grocery Outlet incorporates the above allegations as if set forth fully herein.

53. The Purchase Orders provide:

> [Naftali] shall defend, indemnify and hold harmless [Grocery Outlet] and its parent, subsidiary, or other related or affiliated entities from and against any lawsuit, claim or demand of any kind or nature whatsoever, arising as a result of or in connection with the Goods sold under this agreement or the terms of the Purchase Order.

Ex. A.

54.     The EPA's enforcement action with respect to the Goods arose as a result of and in connection with the Goods Naftali sold Grocery Outlet under the terms of the Purchase Orders.

55.     On May 20, 2021, Grocery Outlet put Naftali on notice that it would exercise its right to seek indemnity from Naftali for any penalties or fines the EPA may impose against it.

56.     The EPA assessed a civil administrative penalty against Grocery Outlet in the amount of $392,000.  Ex. E.  Grocery Outlet paid the penalty on September 14, 2023.

57.     The EPA attributed 59 of the 63 total violations established by the CAFO to the Goods Naftali sold to Grocery Outlet, meaning $367,111.11 of the civil administrative penalty is attributable to the Goods.  Ex. E.

58.     The civil administrative penalty falls squarely within the scope of the indemnity, which applies to any "lawsuit, claim or demand of any kind or nature whatsoever[.]"  Ex. A.  Naftali is obligated to indemnify Grocery Outlet for the portion of the penalty arising out of the Goods Naftali sold to Grocery Outlet.

59.     As of the date of this Complaint, Naftali has refused to indemnify Grocery Outlet for any costs and expenses associated with Naftali's wrongful conduct and the resulting EPA enforcement action, in breach of the Purchase Orders' indemnity provisions.

### THIRD CLAIM FOR RELIEF

**(Breach of Express Warranty – Cal. Com. Code § 2313)**

60.     Grocery Outlet incorporates the above allegations as if set forth fully herein.

61.     Naftali warranted that "the Goods are not subject to any label-change or tag-removal requirements . . . ."  Ex. A.

62.     The Goods' labels claimed that they could sterilize surfaces, kill germs on surfaces, and/or be antibacterial with respect to surfaces, claims that rendered the Goods pesticides under applicable law.

63.     The EPA identified the Goods as unregistered pesticides and thus noncompliant with federal law.  CDPR also found that the Goods were unregistered pesticides and thus noncompliant with California law.  These determinations put Naftali in breach of the express terms of the Purchase Orders' warranties.

64. Because the Goods were unregistered pesticides, the Goods could not be sold as labeled.

65. Naftali's breach of the representations and warranties in the Purchase Orders directly caused the EPA's enforcement action against Grocery Outlet with respect to the Goods.

66. As a direct and proximate cause of Naftali's breach of the representations and warranties in the Purchase Orders, Grocery Outlet suffered damages in the amount it paid for the Goods.

67. Additionally, Grocery Outlet suffered consequential damages as a result of Naftali's breach, including the costs and penalties associated with the EPA's enforcement action as well as reasonable attorney's fees and costs incurred in responding to the enforcement action.

## FOURTH CLAIM FOR RELIEF

### (Breach of Implied Contract)

68. Grocery Outlet incorporates the above allegations as if set forth fully herein.

69. In the alternative, even if the Purchase Orders do not constitute contracts themselves, the Orders demonstrated Grocery Outlet's intention to make a promise to pay valuable consideration in exchange for the Goods that Naftali represented were suitable for resale to Grocery Outlet's customers as products designed to sterilize, to kill germs on, and/or as an antibacterial on both surfaces and skin.

70. Naftali manifested both its intention to sell Grocery Outlet the Goods in exchange for valuable consideration and its assent to be bound by the implied contract by accepting the consideration and delivering the Goods.

71. The parties therefore created an implied contract, with Naftali impliedly promising to deliver the Goods as advertised, i.e., lawfully resalable to Grocery Outlet's customers as products designed to sterilize, to kill germs on, and/or as an antibacterial on both surfaces and skin.

72. As explained above, because the Goods were not registered as pesticides, the Goods' labels could not lawfully make claims that they could be used to sterilize surfaces, to kill germs on surfaces, or as an antibacterial on surfaces. Grocery Outlet therefore could not lawfully resell the Goods as products designed for these purposes.

73. Naftali breached the parties implied contract by delivering nonconforming Goods.

74. As a direct and proximate cause of Naftali's breach of the parties' implied contract, Grocery Outlet suffered damages in the amount it paid for the Goods.

75. Additionally, Grocery Outlet suffered consequential damages as a result of Naftali's breach, including the costs and penalties associated with the EPA's enforcement action as well as reasonable attorney's fees and costs incurred in responding to the enforcement action.

## FIFTH CLAIM FOR RELIEF

### (Implied Contractual Indemnification)

76. Grocery Outlet incorporates the above allegations as if set forth fully herein.

77. "Implied contractual indemnity is a type of equitable indemnity, predicated on the indemnitor's breach of contract with the indemnitee." *Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal. App. 4th 937, 968 (2007) (citation omitted).

78. "[A] duty to indemnify has been implied from the obligation of the contracting parties to perform their promises, the reasoning being that a promise to perform includes an implied promise to perform properly." *Id*. at 972. "Its conceptual basis is the idea of a contracting party's fair responsibility for foreseeable damages caused by its breach of the promises it made in the contract." *Id.* at 973.

79. Grocery Outlet contracted, either explicitly or impliedly, with Naftali to purchase the Goods.

80. Naftali's "promise to perform include[d] an implied promise to perform properly." *Id*. at 972.

81. The EPA's enforcement action was a foreseeable consequence of Naftali's breach of its promise to provide conforming Goods.

82. Naftali is therefore obligated to indemnify Grocery Outlet for the pro rata share of the EPA's civil administrative penalty and any costs and expenses associated with the EPA's enforcement action.

## SIXTH CLAIM FOR RELIEF

**(Breach of Implied Warranty of Merchantability – Cal. Com. Code § 2314)**

83. Grocery Outlet incorporates the above allegations as if set forth fully herein.

84. "[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

85. The minimum requirements for a good to be merchantable are, inter alia: "(a) [The good must] [p]ass without objection in the trade under the contract description; . . . (c) Are fit for the ordinary purposes for which such goods are used; . . . (e) Are adequately contained, packaged, and labeled as the agreement may require; and (f) Conform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2).

86. Naftali is a merchant with respect to the Goods.

87. The Goods would not pass without objection under the contract description, as the Purchase Orders specified the Goods by name and the Goods were advertised to be suitable to sterilize, kill germs on, and/or as an antibacterial on both surfaces and skin. Cal. Com. Code § 2314(2)(a). As explained, the Goods could not lawfully be resold to Grocery Outlet's customers as products designed to sterilize surfaces, to kill germs on surfaces, or as an antibacterial on surfaces.

88. Similarly, because the Goods could not lawfully be resold to Grocery Outlet's customers as products designed to sterilize surfaces, to kill germs on surfaces, or as an antibacterial on surfaces, they are not "fit for the ordinary purposes for which such goods are used." Cal. Com. Code § 2314(2)(c).

89. Additionally, the Goods were not adequately labeled. Cal. Com. Code § 2314(2)(e).

90. Finally, because the Goods' labels claimed that they were suitable to sterilize surfaces, to kill germs on surfaces, and/or as an antibacterial on surfaces, and they were not lawfully registered for such uses, the Goods did not "[c]onform to the promises or affirmations of fact made on the container or label." Cal. Com. Code § 2314(2)(f).

91. Naftali breached the implied warranty of merchantability by failing to deliver the Goods in a condition that meets the minimum requirements for a good to be merchantable, as specified in Cal. Com. Code § 2314(2).

92. Naftali's breach of the implied warranty of merchantability directly caused the EPA's enforcement action against Grocery Outlet with respect to the Goods.

93. As a direct and proximate cause of Naftali's breach of the implied warranty of merchantability, Grocery Outlet suffered damages in the amount it paid for the Goods.

94. Additionally, Grocery Outlet suffered consequential damages as a result of Naftali's breach, including the costs and penalties associated with the EPA's enforcement action as well as reasonable attorney's fees and costs incurred in responding to the enforcement action.

### SEVENTH CLAIM FOR RELIEF

**(Violation of Cal. Bus. & Prof. Code § 17200)**

95. Grocery Outlet incorporates the above allegations as if set forth fully herein.

96. California Business and Professions Code section 17200 prohibits any "unlawful, unfair or fraudulent business act or practices."

97. Naftali has engaged in unlawful, unfair, and deceptive business acts and practices in violation of section 17200 by selling Goods that violate FIFRA and Cal. Food & Agric. Code § 12811, *et seq*.

98. Additionally, Naftali has engaged in unlawful unfair, and deceptive business acts and practices in violation of section 17200 by representing to buyers that its Goods were "in full and absolute compliance with any and all legal and/or regulatory requirements" including as to "labeling [and] packaging." Ex. A.

99. Despite Grocery Outlet's repeated demands, Naftali has refused to reimburse Grocery Outlet for the amounts Grocery Outlet paid for the unsold and unused units of the Goods.

100. Naftali's provision of unconforming and illegal Goods resulted in the EPA's enforcement action against Grocery Outlet.

101. Naftali's unlawful, unfair, and/or fraudulent conduct violates Section 17200 of the California Business & Professions Code.

### DEMAND

102. Grocery Outlet hereby demands a trial of this action by jury.

**PRAYER FOR RELIEF**

**WHEREFORE,** Grocery Outlet prays for the following relief:

A. Awarding Grocery Outlet direct and consequential damages, in an amount to be determined at trial;

B. Awarding Grocery Outlet punitive damages;

C. Awarding Grocery Outlet its costs and penalties associated with the EPA's enforcement action that arose from the Goods;

D. Awarding Grocery Outlet costs and reasonable attorneys' fees incurred in this action and the state and federal enforcement actions against Grocery Outlet; and

E. Such other and further relief that the Court deems just and proper.

Dated: October 13, 2023

TROUTMAN PEPPER HAMILTON SANDERS LLP

By: /s/ T. Scott Mills
    Brian P. Watt
    Elizabeth Holt Andrews
    T. Scott Mills

    Attorneys for Plaintiff
    GROCERY OUTLET, INC.